UNITED STATES of America
v.
John A. WHITE.
Crim. No. 476–62.

United States District Court
District of Columbia.
Dec. 16, 1963.

Harold H. Titus, Jr., Asst. U. S. Atty., for plaintiff.

Bryce Rea, Jr., Thomas M. Knebel, Rea, Cross & Knebel, Washington, D. C., appointed by the Court, for defendant.

YOUNGDAHL, District Judge.

Defendant was convicted of first degree murder by a jury which was unable to agree as to whether punishment would be life imprisonment or death by electrocution. Immediately after the return of this verdict, this Court imposed a sentence of life imprisonment. See D.C. Code § 22–2404, as amended by Pub.L. 87–423 87th Cong. 2d Sess. (1962), 76 Stat. 46. Defendant has now moved for a new trial on several grounds, each of which will be considered separately.

1. Defendant argues that the Court erred in denying defendant's motion for judgment of acquittal at the close of the Government's case on the ground that the Government had not made out a prima facie case of murder in the first degree.[1]

Substantial and credible evidence was introduced by the Government from which the jury could have concluded that the defendant White, by means of a shotgun, shot and killed one Kelly Miller Griffin on the afternoon of May 12, 1962, after the defendant had ordered Griffin to move out of the defendant's home and Griffin had refused. Griffin, since sometime in the fall of 1961, had been living in the house with one Florence Ready, the sister of one Savannah King, the woman with whom the defendant had been living for a number of years. Griffin would get drunk in the home from time to time; in April of 1962 he was sentenced to twenty days in the workhouse for drunkenness. Testimony by both Miss Ready and one William Brent, a friend of the defendant's who was in defendant's house several times on the day of the murder, revealed that Griffin returned to the home on Saturday morning, May 12, after having served his twenty days. After the defendant discovered that Griffin had returned, he told Griffin he would have to find some other place to live and that he would have to get out of the house within three minutes. This conversation took place downstairs. Griffin replied that he did not have to go anywhere, and went upstairs. There was no testimony that the defendant had any weapon at that time; he kept his shotgun upstairs in his closet. Sometime later—how long is not clear— the defendant pushed open the door to the room upstairs occupied by Griffin and Florence Ready. Florence Ready was in bed, and Griffin was standing by the bed. Defendant was holding a shotgun, which he aimed at Griffin and fired. Immediately after the shooting he told Savannah King to call the police. The police arrived at approximately 3:23 p. m.; Griffin died an hour and a half later of hemorrhagic shock, loss of blood volume, and a blast injury through the left chest to the heart and liver.

■ The testimony presented in the Government's case, as outlined above, is amply sufficient to support a verdict of first degree murder. Slight variations in the testimony—concerning, for instance, the distance from the defendant to Griffin at the time of the shooting—were minor. Defendant's attorney had full opportunity to cross-examine, and any inconsistencies were for the jury to consider in evaluating credibility and in determining the facts of the case.

2. The defendant argues that the verdict of first degree murder is not supported by substantial evidence and is contrary to the evidence viewed as a whole.

■ In addition to the above testimony, the jury had for its consideration testimony presented by the defendant— namely, defendant White's own testimony in which he claimed that he acted in self-defense because he thought Griffin was advancing toward him with a knife; the testimony of several reputation witnesses; and the testimony of Savannah

---

1. "Whoever, being of sound memory and discretion, kills another purposely, * * * of deliberate and premeditated malice * * * is guilty of murder in the first degree." D.C.Code § 22–2401.

King. The testimony of Savannah King actually supported the Government's case.[2] She testified to occasions prior to Griffin's being sent to the workhouse on which Griffin's behavior had been upsetting to the defendant, including one time when Griffin had urinated on the living room floor. While these incidents were introduced to show provocation justifying a verdict of manslaughter or second degree murder, the jury also had a right to consider them as indicating a motive on the part of defendant to kill Griffin if he refused to move after returning from the workhouse. In addition, Miss King testified that there had been two arguments downstairs and one upstairs on the day of the murder, all concerning the defendant's insistence that Griffin leave. She also testified that it was the defendant's practice to keep his shotgun unloaded. The jury could therefore have inferred not only that defendant had to go to his closet to get the gun, but also that he had to take time to load it. Miss King also testified that immediately before she heard the shot, she heard the defendant say, "Oh, you're not going to move, ha?"

█ The verdict of first degree murder is thus completely supported by the

evidence viewed as a whole. It was for the jury either to accept or reject the defendant's version, which claimed self-defense, and implicit in the verdict is that they rejected it.

3. The defendant argues that the Court erred in permitting the Government to cross-examine the defendant with respect to a statement made by defendant to the police while in custody and before being brought before a Commissioner pursuant to Rule 5, Federal Rules of Criminal Procedure.

Because the Court had some doubts about the admissibility, under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), of a statement made to the police by the defendant and signed by him, and because the Government's case was ample without the confession, the Court urged the Government not to introduce the statement into evidence and the Government acceded to the request. Before the defendant took the stand in his own behalf, however, the defendant was warned that the Government had a right, under Tate v. United States, 109 U.S.App.D.C. 13, 283 F.2d 377 (1960), to use the statement in a limited manner to impeach any testimony by the defendant which went beyond

2. The Court would be justified in considering Savannah King's testimony as part of the Government's case for purposes of determining whether the Government had proved a prima facie case. The Government in its case-in-chief called Savannah King, but the defendant objected on the ground that she was his common-law wife and that defendant could assert a marital privilege barring her testimony. Savannah King had previously been married in a legal ceremony to another man, which marriage had never been terminated by divorce or otherwise. The Government therefore argued that the marital privilege did not obtain, but decided for purposes of protecting the record on appeal not to call Savannah King. The defendant later, to the surprise of both the Court and the Government, called Savannah King as a witness for the defense. In view of these circumstances, the testimony of Miss King might well have been considered by the Court in determining, above, whether the Government had made out a prima facie case.

If there had been any gap in the Government's case, the defendant by calling Savannah King must be deemed to have waived his right to object to the Court's considering her testimony as filling any such gap. Cf. Cephus v. United States, U.S.App.D.C., 324 F.2d 893, (1963). Were it necessary, it would be particularly appropriate to consider Savannah King's testimony as part of the Government's case, because a recent Court of Appeals case, Postom v. United States, U.S.App.D.C., 322 F.2d 432 (1963), of which the Government attorney was not aware at the time he made his decision to refrain from calling Savannah King, would have permitted Savannah King to testify of her own free will against defendant even if he were her common law husband. But there is no such need to consider her testimony as if it were part of the Government's case, because the testimony actually presented in the Government's case-in-chief was amply sufficient.

"specific and limited exculpatory statements" and which did not deal with an essential element of the offense itself. 109 U.S.App.D.C. at 16, 283 F.2d at 380. The defendant took the stand and testified to the following effect: When he came upstairs Griffin started grinning at him and pushed the door closed in his face. Defendant then opened the door and told Griffin to move out of the house; Griffin responded with a threat to the defendant and defendant's family and started toward his closet. The defendant then left, went to his own closet, and returned with his shotgun. Upon his return to Griffin's door, he said that Griffin was coming toward him and that Griffin had his right hand in his (Griffin's) pocket. The inference was that Griffin had a knife in his pocket. On cross-examination, the defendant was asked if he had told the police that Griffin had his hand in his pocket and threatened him. The defendant replied that he did not remember, and volunteered the fact that he had made a statement to the police. The Court then permitted the Government to refresh his recollection as to whether or not he had told the police about the threat and the hand in the pocket by reading silently, to himself, his signed statement. The defendant then testified that he still did not remember whether he had told the police that Griffin had threatened him or that Griffin had his hand in his pocket, but that he did not see it in the statement.[3]

■ Assuming without deciding that the statement was obtained in violation of Mallory, supra, this extremely limited use of such statement was completely within the rationale and requirements of Tate, supra, and took into full account the competing policies of the value of the exclusionary rule and the necessity of truth-telling. Previous silence

on the details of such a story was proper impeachment.

4. Defendant argues that the Court erred in refusing to charge the jury, as requested by defendant, that if the jury was convinced beyond a reasonable doubt that defendant was guilty "of some grade of culpable homicide" but was reasonably doubtful as to whether he was guilty of first or second degree murder or manslaughter, it could not find him guilty of a higher offense than manslaughter.

Defendant cites McAffee v. United States, 70 U.S.App.D.C. 142, 152–153, 105 F.2d 21, 31–32 (1939) in support of his proposition. But McAffee dealt with an entirely different situation. There the trial judge apparently thought it sufficient "merely to define the elements which comprise each degree of the crime charged and then to tell the jury that the defendant must be found guilty beyond a reasonable doubt." 70 U.S.App.D.C. at 152, 105 F.2d at 31. The Court of Appeals held this to be error because the jury might be confused "unless the reasonable doubt requirement is made specifically applicable to doubt as to the degree of the crime." Ibid.

■ There was no possibility of such confusion in the minds of the jurors under the instructions as given by this Court. The requirement of proof by the Government beyond a reasonable doubt was consistently, repeatedly, and individually applied to each degree of homicide and to each essential element of each degree. In fact, the charge requested by the defendant would have itself caused confusion, because it erroneously assumes that there is some offense called "culpable homicide," the elements of which the jury would understand. The various degrees of homicide are defined as separate offenses in the statute and they were defined separately to the jury,

---

3. The statement, which the Court had previously examined in chambers, was long and detailed. For six paragraphs, the defendant recounted what happened, without interruption by questions. There was no mention in the statement of any

threat or of Griffin having his hand in his pocket. The last question asked was whether the defendant had anything to add to the statement, and he said that he had nothing to add.

with a requirement of proof beyond a reasonable doubt applied individually to each. The jurors were told that if they were not unanimously convinced that the Government had proved beyond a reasonable doubt that the defendant was guilty of first degree murder, then they should pass on to a consideration of the lesser included offense of second degree murder; and that if they were not unanimously convinced that the Government had proven beyond a reasonable doubt that the defendant was guilty of second degree murder, then they should pass on to a consideration of the second lesser included offense of manslaughter; and that if they were not unanimously convinced that the Government had proven beyond a reasonable doubt that the defendant was guilty of manslaughter, then their verdict must be not guilty. This instruction meets all of the requirements of McAffee, supra, and is far more clear than the instruction requested by defendant. Defendant therefore cannot rightly complain of the Court's refusal to give the requested instruction.

5. Defendant argues that the Court erred in excluding certain proffered testimony by defendant's mother and by defendant's employer.

■ As to defendant's mother, the proffer dealt with two matters. The proffer as to the first was as follows:

"I intend to prove, Your Honor, through Mrs. White, the conduct of John White as a boy, his relationships with his companions, his actions insofar as they go to the peaceable, orderly nature of his behavior during the period he lived at her home." (Tr. 424.)

Such testimony on the conduct of defendant in his mother's home years before[4] the date of the offense would have been so remote as to be completely irrelevant and immaterial to any of the issues in this trial. See Lomax v. United States, 37 App.D.C. 414, 417–418 (1911). "Evidence as to reputation must be confined to that existing in the community in which the person resides at and shortly preceding the occurrence of the event with reference to which the evidence is sought to be adduced." Id. 37 U.S.App. D.C. at 418. The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded.

The second part of the proffer concerning defendant's mother was that she would "testify to expressions of bias on the part of Florence Ready" (Tr. 425), the woman with whom Griffin was living and the sister of Savannah King. The testimony would have been that

"subsequent to the shooting, on the evening of the shooting, Florence Ready stated in the presence of Mrs. White [defendant's mother] that if John White ever got out on the street again, she would fix him. (Tr. 425–6.)"

■ The Court excluded this proffered testimony because counsel for the defendant had failed to ask Florence Ready during the cross-examination, following her testimony as part of the Government's case-in-chief, whether she had made this statement. If Florence Ready had unequivocally admitted that she made the statement, there would have been no necessity to call defendant's mother. If Florence Ready had denied making the statement, then defendant's mother would have been permitted to impeach Florence Ready's testimony by testifying to the alleged statement of bias. This is the proper way to show bias on the part of a witness when such showing depends upon a prior statement of the witness. Smith v. United States, 283 F.2d

---

4. Defendant himself testified that he had been living in his grandfather's house since March or April of 1961 (Tr. 291), and that prior thereto he had been living with Savannah King since 1953, except for a period of imprisonment from 1955 to 1957. (Tr. 289.) The latest period to which this testimony of defendant's mother could have applied must, therefore, have been 1953. Defendant was born in 1926. No issue of insanity, to which such testimony about defendant's boyhood might have been relevant, was raised.

16, 20–21 (6th Cir. 1960), cert. denied, 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961). See 3 Wigmore on Evidence (3d ed.) § 953; 98 C.J.S. Witnesses § 566.[5]

Although there is no controlling authority by the Court of Appeals for this circuit one way or the other on the issue of whether a foundation need be laid when an attempt is made to show bias by a prior statement of the witness, the clear indications are that our Court of Appeals follows the general rule as just stated. In Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633 (1943), cert. denied 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145, there is dictum to the effect that a statement of bias could be proved without first inquiring of the witness whether she, in fact, made the statement, 77 U.S.App.D.C. at 22, 135 F.2d at 641, although the court later suggests that such extrinsic proof of a biased statement would be objectionable as hearsay unless a foundation had been laid. 77 U.S.App.D.C. at 23, 135 F.2d at 643. In the case itself, a foundation *had* been laid on cross-examination, and the court upheld both the laying of the foundation and the subsequent contradictory proof of a biased statement, emphasizing the importance of the preliminary cross-examination as a means of eliciting the full circumstances surrounding whatever statements were made in order "to test their truth by the advocate's art of search." Ibid. Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261, 21 A.L.R. 1074 (1950) is not to the contrary. The statement in that case to the effect that bias may be shown either by contradiction or by independent evidence was made in the context of reversing a trial judge who had refused to permit the showing of an *action* suggesting bias by *either* contradiction or independent evidence. Villaroman's dictum

is particularly irrelevant because the evidence of bias there at issue was the existence of a pending civil suit brought by the witness as plaintiff against the defendant for damages growing out of the assault which was the subject of the criminal charge; such a *fact* suggesting bias may not require the pressures of cross-examination to bring out the full truth, but a *statement* suggesting bias does require such cross-examination, as Ewing, supra, indicates. Both Ewing and Villaroman must be viewed in the context of the general rule which has often been stated:

> "It is a well-settled principle that a witness cannot be discredited or his hostility or bias shown by proving statements made by him outside of court which do not harmonize with the statements made by him on the witness stand, until his attention has been called specifically to the former statements, with particularity as to time, place, and circumstance, so that he can deny or explain them." Gordon v. United States, 53 App.D.C. 154, 156–157, 289 F. 552, 554–555 (1923).

Gordon actually applied the rule to statements which would have shown not that the witness was biased, but rather that he knew nothing about the alleged crime. The rule itself, however, as the case declares, sets forth the proper procedure when bias is sought to be proved by prior statements of the witness.

 The Court carefully explained this rule to counsel for the defendant, who objected but failed to request that Florence Ready be recalled to the stand in order that a proper foundation might be laid. Such a request would have been relevant, since the possibility that the allegedly biased witness might no longer be available to testify and that the Government might therefore be unfairly

---

5. "While there is conflict of authority as to the necessity of laying a foundation to impeach a witness for bias or hostility, and it has been stated that it rests within the judicial discretion of a trial court whether or not to admit impeaching

statements where no foundation has been laid, it is generally held to be necessary where impeachment is based on the witness' statements or declarations." 98 C.J.S. Witnesses § 566. (Footnotes omitted.)

surprised by testimony as to bias is the strongest reason for the rule requiring the laying of a proper foundation by a direct question to the allegedly biased witness.

> "By laying a basis for such testimony on cross-examination, counsel is advised of what he may have to meet and can ascertain if he needs to call other witnesses or prepare his answer, if any there be. When such testimony is brought in extrinsically, opposite counsel is taken by surprise and has no opportunity to meet the unexpected situation. Surprise is not favored in the Federal Courts. Smith v. United States, supra, 283 F.2d at 21." [6]

"The same reasons of fairness apply in an attempt to show bias or hostility from declarations of a witness as apply in contradictory or inconsistent statements; he must be given a full opportunity for explanation * * *." People v. Sweeney, 9 Cal.2d 793, 357 P.2d 1049, 1054 (1961). Since "[n]o application was made for leave to recall [the witness], for the purpose of laying the proper foundation, after the court had sustained the objection," Gordon v. United States, supra, 53 App.D.C. at 157, 289 F. at 555, defendant waived any right to object now to the exclusion of this proffered testimony by defendant's mother.

As to the defendant's employer, the proffer was that the witness would testify to defendant's "conduct as an employee" (Tr. 427) and defendant's activities in his own home, including "the condition of his home" (Tr. 428) and defendant's and Savannah King's "conduct as husband and wife." (Tr. 429). Defendant argues that such testimony would have been admissible as the best evidence of character, and also to show facts which might have led the jury to conclude that he was justifiably provoked into the homicide.

■■■■ "[T]he only admissible evidence of good character is what people generally, who know the accused, think about him * * *." Stewart v. United States, 70 U.S.App.D.C. 101, 102, 104 F.2d 234 (1939). "For the word 'character' in this sense means reputation as distinguished from disposition." Ibid. See Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Character witnesses are therefore not permitted to testify to their own opinions as to whether a defendant is a person of good character, but only as to the defendant's reputation in the community in which defendant lives (if the witness has an opinion as to what such reputation is) for such qualities as peacefulness, sobriety, dependability, honesty, and good character generally. Under this familiar role, the proffered testimony was obviously inadmissible, since it sought to show good character by direct testimony of the conduct of defendant at work and at home. "[E]vidence of good or bad character is restricted to general reputation, and does not extend to particulars * * *." Josey v. United States, 77 U.S.App.D.C. 321, 323, 135 F.2d 809, 811 (1943).

---

6. See 3 Wigmore on Evidence (3d ed.) § 953:

> "On the principle of fairness and of the avoidance of surprise, the settled rule obtains, in offering evidence of prior *self-contradictory* statements, that the witness must first be asked, while on the stand, whether he made the statements which it is intended to prove against him. Does the same rule apply to the use of evidence of former utterances of the witness indicating *Bias*? Must the witness first be asked whether he made them?

> "He must, as a matter of principle; for the same reasons of fairness that require a witness to be given an opportunity of denying or explaining away a supposed self-contradictory utterance require him also to have a similar opportunity to deny or explain away a supposed utterance indicating bias."
> "The treatise goes on to state that the rule should not be 'stiffly and arbitrarily' applied; the present case, however, presented precisely the kind of situation for which the rule was designed."

Defendant argues that this rule is outdated in modern urban communities where people tend to move frequently. But such an objection can be met by a sensible scope to the word "community," rather than by an abandonment of the rule. The community in which a man lives is not necessarily a geographical unit, but is rather composed of those relationships with others which arise where a man works, worships, shops, relaxes, and lives. Evidence tending to show a defendant's reputation in such places is no more difficult to establish than his reputation in his particular city-block, which may or may not be important in establishing the defendant's reputation. Indeed, the reason for the rule limiting character witnesses to testimony about reputation is just as relevant today as it was in the past. A personal opinion that a defendant is a person of good character is so subjective as not to be subject to meaningful cross-examination; cross-examination would degenerate into an argument with the witness, and rebuttal witnesses who happened to hold contrary opinions would have to be permitted to testify. An opinion as to reputation, however, (although composed of numerous individual subjective opinions) is essentially an objective fact about a defendant, thus subject to reasonably limited cross-examination. A witness can be accurate or inaccurate as to reputation, but his opinion as to character is essentially his own personal estimate. In order, therefore, to keep a trial within reasonable bounds the familiar rule barring testimony such as that proffered by defendant remains a wise one.

Nor was the proffer of the employer's testimony sufficiently related to the issue of justifiable provocation to be admissible. The proffer was extremely general; there was and is no indication at all that the employer had seen any of the acts allegedly committed by Griffin in the months before the homicide. Other witnesses had testified fully to first-hand knowledge that Griffin had urinated on the living room floor, had shown defendant and Savannah King how fast he could draw a knife from his pocket, had in a drunk condition picked up defendant's baby, had created a fire hazard by leaving a coffee pot on the stove, and had generally been a disturbing influence in defendant's home. Competent testimony about any such incidents was permitted to go before the jury without limitation, and defendant therefore had an opportunity to develop his theory of justifiable provocation as completely as possible. One character witness, defendant's next-door neighbor, was even permitted to testify that he recalled a change in the circumstances and pattern of defendant's house after Griffin came to live there and that although defendant's house previously had not been "the most peaceful residence in the neighborhood," it was "not quite as peaceful" after Griffin moved in. (Tr. 419–21.) The proffer as to the employer, however, did not even indicate that the employer had knowledge of any such change in the conditions of the home. In fact, the employer was proffered as a character witness (Tr. 344) whose testimony would not have related to reputation, and the proffer was therefore properly rejected.[7]

6. Defendant argues that under the new statute which gives the jury the right to impose a sentence of either death or life imprisonment upon a verdict of guilty of first degree murder, or to leave the choice between these sentences to the discretion of the Court, the Court should have limited the jury's initial deliberation to the question of guilt and there-

7. Defendant states in his motion for a new trial that the testimony of defendant's mother was also proffered on the subject of the conditions of defendant's home during the six months preceding the homicide, but no such proffer was made. The proffer of the mother's testimony was limited to the two points discussed above—defendant's boyhood, and bias on the part of Florence Ready—and did not include anything about conditions of the defendant's home. In any event, such a proffer would have been rejected for the reasons just given in regard to the proffered testimony of the employer.

after should have permitted the defendant to present evidence in mitigation and extenuation in the event that the jury found him guilty of first degree murder.

■ Such a two-stage determination is not mentioned in the statute,[8] and it should not be implied. Defendant clearly can only be helped by being permitted to introduce character testimony possibly relevant to the choice of sentences before the jury has agreed upon the verdict itself. It is fairest to the defendant for the jury to have the full range of clearly distinguished alternatives before them for consideration at one time. Thus this Court submitted a verdict form which read:

> "Guilty of First Degree Murder, punishment of Death ————;
>
> "Guilty of First Degree Murder, punishment of Life Imprisonment ————;
>
> "Guilty of First Degree Murder, unable to agree as to punishment ————;
>
> "Guilty of Second Degree Murder ————;
>
> "Guilty of Manslaughter ————;
>
> "Not Guilty ————."

The Court believes that this form of verdict, and the one-stage proceeding which it requires, best carries out the philosophy of the statute and is fairest to the defendant. In any event, defendant's objection in this case is moot, because the jury was unable to agree as to which punishment should accompany its verdict of guilty to first degree murder, and the Court, which was thus called upon to make the choice, imposed a sentence of life imprisonment.

For the reasons stated above, defendant's motion for a new trial will be denied.

8. "The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment." D.C.Code 22–2404, as amended by Pub.L. 87–423 487th Cong 2d Sess.1962 76 Stat. 46.