**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marvin HAYUTIN and Leon Nash,
Defendants-Appellants.**

**Nos. 206, 444, Dockets 31465, 32164.**

United States Court of Appeals
Second Circuit.

Argued March 11, 1968.

Decided July 29, 1968.

Certiorari Denied Nov. 25, 1968.
See 89 S.Ct. 400, 402.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York (Frank M. Tuerkheimer, Paul R. Grand, Pierre N. Leval, Asst. U. S. Attys.), for appellee.

Carro, Spanbock & Londin, New York City (Jerome J. Londin and Allen Green, New York City), for appellant Leon Nash.

Shea, Gallop, Climenko & Gould, New York City (Milton S. Gould, Michael Lesch, and Samuel J. Gilbert, New York City), for appellant Marvin Hayutin.

Before KAUFMAN and HAYS, Circuit Judges, and RYAN, District Judge.

RYAN, District Judge:

We have here two appeals from judgments of conviction following separate trials, but emanating from the same indictment.

Nash's appeal is from a conviction on five counts after the first trial—on which the jury had disagreed as to Hayutin but convicted 5 other defendants. Hayutin appeals from his conviction on 14 counts after his retrial. Because Nash's sentence had been deferred until February 20, 1967, he did not appeal when his co-defendants did, United States v. Bilotti, 380 F.2d 649 (2d Cir. 1967).[1]

The indictment filed on March 4, 1965, charged 14 individual defendants in 48 separate counts with violations of the anti-fraud provisions of the Securities Act of 1933 (15 U.S.C. Sec. 77q(a)). The prosecution arose from the public marketing and the unregistered sale of common stock of Allied Entertainment Corporation of America during the period from July 1, 1962 through May, 1963. Nash was sentenced to a year and a day on each count, sentences to run concurrently, and fined $500. Hayutin was sentenced to 2½ years on each of 14 counts, sentences to run concurrently, and he was fined $14,000. Since the appeals are from judgments of conviction following separate trials,[2] we have considered and decided them separately.

Both convictions are affirmed.

### The Nash Appeal

Nash was convicted of conspiring to make illegal unregistered sales of common stock of Allied Entertainment Corporation of America, Inc. (Allied) and to use the mails and telephone in furtherance of a scheme to defraud in the sale of the Allied stock (Count 1);[3] making unregistered sales of the Allied stock in violation of Section 5 of the Securities Exchange Act of 1933, 15 U.S.C. § 77e(a) (Counts 4 and 5); and making fraudulent sales of Allied stock in violation of Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q (Counts 22 and 23).

These are the facts as they implicated Nash and by necessity Hayutin, which were developed at the trial.

The conspiracy and the subsequent substantive crimes were born of the efforts of two dentists—Breger and Blistein—to rescue Allied, a small popular music publishing business they had formed, from financial disaster due to an earnings deficit accumulated over four years and lack of working capital. The two dentists-turned financial operators were having difficulty selling 60,000 shares of Allied stock which Allied was offering publicly at $2.50 per share pursuant to an exemption from registration under Regulation A of the Securities and Exchange Commission Rules.[4] By August 20, 1962, only 20,000 to 25,000 shares of the total 60,000 shares offering had been sold. Although Reuben Rose & Co., a brokerage firm, was the underwriter, the actual peddling of the stock was done by Breger and his associates. At this time the securities markets were depressed and a partner of the Rose firm informed Breger that, unless an additional 10,000 to 15,000 shares were sold by September 17, 1962, the date of the expiration of the Regulation A offering, the proceeds already realized would have to be refunded. Breger sought help from

1. Whatever may have been the occasion for the delay, it has resulted in the seriatim hearing of appeals, of defendants who were jointly tried and convicted, a procedure which should be avoided.

2. At both trials, the principal witnesses for the Government were the defendants Schreiber and Gravino, and the co-conspirators Breger and Gafni.

3. Nash was the only defendant convicted on this count, but three co-defendants pleaded guilty to the count and there were other co-conspirators not named as defendants.

4. Regulation A (Title 15, Section 77c(b), Securities Act of 1933) exempts certain public offerings of stock of an aggregate offering price not to exceed $300,000 provided such offering complies with the provisions contained in the regulation (17 C.F.R. Sec. 230.251–63).

one Gearhart, a "stock trade" and market manipulator. Gearhart introduced Breger to Hayutin.

Breger related his problems to Hayutin, who then arranged a meeting between Breger and Gravino. It was following this that Gravino approached Nash on the matter. Gravino and Nash were over-the-counter brokers; Gravino was the sole stockholder of Albion Securities Co., Inc., and Nash the sole stockholder of Seaboard Securities Corp. Both of them had had prior dealings with Hayutin.

Gravino told Nash that Hayutin had told him of Breger, of Allied's offering and of the necessity to sell a large number of Allied shares in a short period. Gravino also told Nash that, if he and Nash were to help to sell these shares, they would receive 50 to 75 cents per share in cash over the underwriting commission.[5] Nash told Gravino to arrange for a payoff of $1.25 per share.

On September 2, 1962, there was a meeting at Hayutin's apartment, at which Hayutin, Nash, Breger and Blistein were present. Hayutin made good on the recommendation Gearhart had given Breger that Hayutin "could do the job." Hayutin negotiated a deal. Gravino and Nash undertook to sell approximately 10,000 shares by the close of the offering on September 17, 1962; Breger agreed to pay them a secret cash commission of $1.00 for each share sold, which was to be additional to an offering commission of 25¢ per share, which they were to share with Rose & Co., the underwriters. Gravino and Nash agreed to pay Hayutin 25¢ per share out of what they collected. Gravino and Nash also promised to sell additional shares after September 17, 1962, by which date, Gravino and Nash had sold 7,000 of the 10,000 shares. A meeting was held that day at Gravino's office, which Hayutin, Gravino, Nash, Breger and Gravino's partner attended. Breger then paid Gravino and Nash $7,000 in cash, to be divided between them, and they paid 25¢ a share or $1750 in cash to Hayutin.

While Gravino and Nash were selling the 7,000 shares of the offering, Gearhart was the principal trader in Allied Stock. He, working with and protected by Breger's promise to buy from him every share he was forced to purchase, maintained an inflated and rigged price for the stock. Nash and Gravino had met with Hayutin, Breger and Gearhart when the details of this rigged bid operation were set, and, in fact, Nash encouraged and policed Gearhart's activities to the extent of offering him a call at $2.50 when Gearhart succeeded in raising the price to $4 and reporting him to Hayutin when he failed to maintain the price.

Hayutin's, Gravino's and Nash's connections with Breger's activities and Allied financing did not end with the public offering. Breger had told Hayutin in September, 1962, that even with the underwriting, Allied needed some $50,000 in working capital. Hayutin suggested to Breger and Blistein that, during the offering, they buy 5,000 shares of Allied to help in the success of the offering and that these shares could later be resold through Gravino and Nash. After the close of the offering, Hayutin arranged with Gravino and Nash to have them sell publicly these shares which Breger and Blistein had purchased in nominee names. Gravino and Nash agreed with Hayutin that they would pay him 25¢ for each share so sold and that they would equally divide the balance received from Breger. They undertook the sale of the stock, and Hayutin arranged for its delivery. On October 2, 1962, Breger, Hayutin, Nash and Gravino again met in Gravino's office. Breger had with him the 5,000 certificates for the shares purchased by him and Blistein in the names of the nominees. At Nash's suggestion, the stock of Breger's nominees was sold through Gravino and that of the Blistein's nominees through Nash. Breger had brought no ready cash for the payoff to Nash and Gravino and Hayutin, but this presented no obstacle to their ingenuity. Breger endorsed the name of his nominee to a check payable to her, it was cashed and

---

5. The offering circular disclosed a commission of 25 cents a share.

the proceeds turned over to Nash and Gravino, who, in turn, paid over to Hayutin his 25¢ per share. The remaining nominee shares were later sold by Gravino and Nash, and certificates delivered to them by Breger who paid them off as before. The evidence showed that Nash sold a total of 14,000 Allied shares, receiving payoffs of $15,000.

The unregistered sale of some of this 5,000 lot by Nash's firm to two customers is charged in Counts 4 and 5 to be in violation of Title 15 U.S.C. Sec. 77b(11), 77d(1) and 77e(a), because they were shares owned by Breger and Blistein "controlling persons" of Allied.

Count 4 charges that on October 1, 1962, Nash sold 100 Allied shares to George F. and Eloise T. Roebrig and used the mails to send them a confirmation of the sale. Count 5 charges Nash with the sale on October 9, 1962 of 300 Allied shares to one Bart Feller, and mailing to him a confirmation.

The stock involved in these sales was registered in the names of Chusid and Pisapia, sisters of Blistein who was a person in control. The Chusid-Pisapia shares were part of the shares which had been purchased by Blistein in the names of his sisters as nominees during the initial Regulation "A" offering.

On these two counts, Nash urges that the evidence was insufficient to convict him in that there was confusion arising from the lawful sales of the Regulation "A" securities through September 17, 1962, and the subsequent alleged unlawful sales of unregistered securities; and that there was insufficient proof that the Blistein stock sold by Nash, part of which he sold as evidenced by the confirmations, was controlled by Blistein and was subject to registration, and that Nash knew this.

Both of these contentions are overwhelmingly refuted by the evidence. The placing of Blistein stock in the hands of nominees for subsequent sale by Nash and Gravino, after the expiration of the Regulation A offer, was part of a plan as to which Nash was a principal actor.

Delivery of these certificates was made by Breger, not by the nominees, and it was he who paid Nash his kickback for his successful efforts in their prior sale. The certificates which his two customers received were the certificates held in the names of Bristein's nominees, which Breger had delivered to Nash at Nash's suggestion. The fact that these certificates were delivered to the customer at a later date than that of the confirmation did not alter the fact that the stock they represented had been sold as evidenced by the confirmation. The subsequent delivery of the certificates did but seal the sale. As for Nash's lack of knowledge that this was control stock, raised in defense, the Court's charge was more than fair to defendant.

Among these sales were the fraudulent sales charged in Counts 22 and 23 carried out by Nash through his operating front, Seaboard Securities Corp., and his salesmen Finkleman and Pollinsky. As to these counts, Nash has argued three assignments of alleged error, none have merit or substance.

Count 22 charged Nash with fraudulently selling to Reverend Arthur Dolge on October 12, 1962, 400 shares of Allied stock at $3.50, a sale effected through Finkleman and confirmed by mail. A previous sale had been made to the Reverend Dolge by Nash through Finkleman on September 5, 1962 of 300 shares at $2.50.

Count 23 charged the fraudulent sale by Nash to a Mrs. Lillian Blum on October 16, 1962 of 100 shares of Allied at $3.50. This sale was made by Nash's salesman Pollinsky; Mrs. Blum, too, received by mail a confirmation of the sale.

Nash's first assignment of error is that the evidence was insufficient to sustain conviction on these fraud counts.

We have pointed out Nash's participation in the market manipulation, maintaining the rigged price of Allied stock and his arranging for and receiving a substantial share of the cash kickbacks of $1.00 to $1.50 per share over and

above the disclosed underwriting commission. Nash supervised his salesmen and instructed them to tell purchasers only what was stated in the offering circular. No claim is made that these purchasers were told either of the market manipulations or of the concealed payments made to Hayutin, Gravino, Nash or Gearhart. All that was disclosed in the Regulation A prospectus was the 25¢ commission to the underwriters. Evidence of the concealment of manipulation alone, and certainly combined with concealment of the payments in excess of the amount stated in the offering circular as commission, was sufficient proof of the fraud charged (3 Loss, Securities Regulation, pp. 1560–1561; Thornton v. Securities and Exchange Commission, 171 F.2d 702 (2d Cir., 1948); and Securities Exchange Commission v. Torr, 15 F.Supp. 315, 317 (S.D. N.Y., 1936), rev'd on other grounds 87 F.2d 446 (2d Cir., 1937)).

■ The venue argument that there was no proof of actual mailings in the Southern District of New York is answered by the ample circumstantial evidence establishing the mailings in this district. It was shown that both purchasers received the confirmations by mail and that both were residents of the Eastern District of New York. The confirmations, printed on elaborate forms, bear the legend of Seaboard Securities and state its address to be at 80 Wall Street, New York; no other address is given. Its selling activities— by telephone, by mail and in person— were conducted from this address[6] and the mailing from the Wall Street address was in no manner questioned at the trial. Venue was sufficiently established (Hill v. United States, 284 F.2d 754 (9th Cir., 1960), cert. den. 365 U.S. 873, 81 S.Ct. 908, 5 L.Ed.2d 862).

■ Second, Nash complains that the charge of the Court was erroneous because, over his objections, it was charged that "a principal is responsible for the crimes of his agent." The general tenor of this contention is that the charge conveyed to the jury the erroneous impression that Nash could be held criminally responsible for misleading representations, made by his salesmen without his knowledge or authorization.

Here, Nash has dissected the charge and, quoting out of context but an isolated portion of it, argues that the instructions as a whole were erroneous and confusing. The trial judge in his charge recognized that there was no general rule in law which makes a principal criminally responsible for the unauthorized acts of his agents, employees or even of his salesmen, and very emphatically told the jury that it "would have to be convinced beyond a reasonable doubt that the proof shows that the defendant himself dominated and controlled his salesmen, and also knew and was participating in the scheme to defraud or sell Allied by means of fraudulent misstatements or statements"— instructions which were repeated.

■ Finally, Nash presses as error the Court's refusal to receive testimony of one Roselin Birnbaum which he contends would support his defense that Breger was the source of the false representations. Objection to this testimony by the Government was sustained by the Court on the ground that it was irrelevant, being only remotely collateral. An offer of proof was permitted to be made and rejected. Breger had already testified that Nash and others had conspired with him to defraud the public and he admitted that he had made numerous false representations to the public in furtherance of the conspiracy. The proffered testimony in no way contradicted the Government's contentions or Breger's testimony; it was simply cumulative proof on an uncontested matter.

■ The attack on the Court's charge on the conspiracy count is unfounded. Judge Tyler made it clear that proof of the substantive counts, if found to have

---

6. Pollinsky invited Mrs. Blum down to the office at that address to persuade her to buy the stock she did.

been in furtherance of a conspiracy, might be considered by the jury as overt acts in proof of the conspiracy.

With one exception, the numerous other alleged errors are so petty as to require no discussion. The exception is the point now urged by Nash that Rule 24(c), F.R.Cr.P., was violated when the trial judge refused the defendant's request to discharge the three remaining alternate jurors after the jury had retired to consider its verdict.

■■ The provision of Rule 24(c) that an alternate juror who does not replace a regular juror "shall be discharged after the jury retires to consider its verdict" is a mandatory requirement, as is that of Rule 23(b) providing for a jury of twelve unless a lesser number is stipulated to in writing by the parties. There is no rule providing that the Court, or the parties, may stipulate for a jury of more than twelve, twelve being the magic number (United States v. Virginia Erection Corporation, 335 F.2d 868 [4th Cir.]). In the face of the mandatory requirement of Rule 24(c) and the Committee's failure at the time of its adoption to include a proposal to permit an alternate juror to replace a regular juror during the deliberations, it is difficult to understand what purpose is to be served by retaining the alternate jurors once the case has been submitted.[7] The reason advanced by the Government in its brief that this procedure presents counsel with the choice of consenting to a substitution if one of the regular jurors became disqualified "prior to the end of the jury deliberations" rather than face a retrial or proceed with less than twelve, is no reason in the absence of any rule or statute authorizing such consent. United States v. Gottfried, 165 F.2d 360 (2d Cir.), cited by the Government, dealt with the clear right of substituting the alternate prior to submission of the case to the jury.

The prejudice flows from the fact that a defendant runs the risk of being tried by more than the twelve jurors guaranteed to him by the Constitution and the Rule, or of being placed in double jeopardy by being tried by more than one jury (Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854).

The absence of benefit being so clear and the danger of prejudice so great, it seems foolhardy to depart from the command of Rule 24.

We turn to the record to see whether in fact, as Nash argues, he ran the risk of having his guilt determined by the three alternates in addition to the regular jurors by reason of the fact that the alternates were in a position to influence the jury in its deliberations.

On this record we can make no such findings. The record shows that the trial judge ruled that three alternates "will have to stay separately" and added "we will have a separate room, and you will be brought back every time the jury itself comes in, if they ever do, to ask any questions and so on." Separate marshals were sworn and assigned for the regular and for the three alternate jurors. Each time during their deliberations that the regular jurors came into the courtroom for further instructions and were seated in the jury box, the alternates were also in the jury box. Nowhere does it appear that they ate in the same restaurant, rode in the same conveyance, or slept in the same hotel.

There is nothing in the trial record which indicates that there was any communication between the regular and alternate jurors after the submission of the case to the jury for verdict. There is no dispute that the record shows that at no time were the alternate jurors in the jury room with the jurors.

■ On the record before us, we cannot find that defendant Nash was prejudiced by the presence of the alternates.

---

7. 29 F.R.D. 43.46—Orfield, Trial Jurors in Federal Criminal Cases; Tentative Draft A. B. A. Project on Minimum Standards for Criminal Justice—Trial by Jury—Institute of Judicial Administration, May 1968, op. cit.

The Government has filed an affidavit by Assistant United States Attorney Grand to supplement the record for the purpose of clarifying the procedure which was followed at the trial of this case. This is not the place for such clarification and we deny leave to make it part of the record, without prejudice to any facts the Government or Nash might wish to develop in some other proceeding.

### The Hayutin Appeal

Hayutin was convicted of conspiracy to violate Sections 5 and 17 of the Securities Act of 1933 and of aiding and abetting in illegal unregistered sales of Allied common stock by the other defendants (Counts 1–6, 8, 10, 12, 14, 16, 18, 19 and 21).

Counts 2–6 related to the participation by Hayutin in the sale by Nash and Gravino of the 5,000 shares of Allied stock which had been purchased by Breger and Blistein in the names of nominees during the Regulation A offering. The remaining eight counts related to Hayutin's participation in further sales of blocks of shares of Allied stock, made on a rigged New York market in connection with some merger deals engineered by Hayutin. Having successfully disposed of the 5,000 shares without benefit of registration and anxious to market much larger amounts of the Allied stock, Hayutin proposed that Allied acquire the assets of two corporations— Tap Records, Inc., and American Stereophonic Corporation—controlled by Miklos Gafni, the president. Both corporations were in financial straits. Hayutin introduced Breger to Gafni and proposed the merger, which was to be accomplished by Allied's acquiring the assets of American Stereo in exchange for 69,500 shares of Allied, and the assets of Tap in exchange for 62,500 shares of Allied. For his part in arranging the acquisition, Hayutin was to receive 10,000 shares of Allied, which at the time was selling for over $3 a share.

A large portion of the shares, ostensibly used to acquire those two companies, was in fact retained by Breger and Blistein in the name of Harold Schreiber, a nominee brought into the deal by Hayutin. The stock was "sold" to Schreiber under guise of a sale by his wife of antique tapes and records to Tap in exchange for its stock. The stock held by Schreiber was then sold through kickbacks to various brokers to the public but when the large volume of the sales in New York made it difficult to maintain the artificially rigged price on the New York market, Hayutin arranged to sell shares in Europe through his business associate Klaus Fischer, Director of the Bankhaus, Schneider & Munzing in Munich.

Hayutin flew to Germany with Schreiber and there agreed with Fischer to have him peddle the stock in Germany at a $1 kickback, Fischer sending the proceeds in cash back to the defendant in New York. In addition, through reputable brokers in New York with whom his bank dealt, Fischer sold $17,700 of these "Schreiber" shares in seven blocks of 500 shares. In order to sell the Allied stock which Gafni had received for American Stereo and Tap upon Hayutin's instructions, Gafni had 24,666 shares of his Allied stock issued or transferred to the names of his wife and relatives. All of this unregistered control stock was subsequently sold to the public. Letters signed by these nominees, claiming all the shares to be exempt from registration, were admitted to have been composed by Hayutin in his handwriting. All the activity came to an end with a collapse of the Allied market. Hayutin's efforts had resulted in the illegal unregistered sale of nearly 50,000 shares of Allied stock, for which up to December 31, 1962 he had received $4250 in cash for his part of the Gravino and Nash sales; a share in the $7500 fee which was paid to Schreiber for the use of his name and his assistance in bringing about the sale of the stock registered to him; and more than 10,000 shares of Allied stock.

Hayutin's counsel concedes that at the trial there was substantially no

controversy as to most of the essential facts and that a crime had been committed. He did not argue in defense that the two distributions of Allied stock to the public between September 17, 1962 and the end of May, 1963 were exempt from registration. But he contended, contrary to the Government's contention that Hayutin had masterminded the criminal plot, that Hayutin was unaware of any wrongdoing; that although a crime had been committed, he had not been a participant; that Breger had been violating the federal securities law long before he ever met Hayutin and that he, Hayutin, had been made the victim of a conspiracy by Breger, Gafni, Schreiber and Gravino to cast all blame upon him. Hayutin also contended that these four conspirators, caught in their wrongdoing, further agreed to falsely testify against him and thus escape just punishment by falsely charging him with being the directing genius of their operations. In connection with this aspect of the defense, Hayutin says that there was error in the trial judge's refusal to receive the testimony of two defense witnesses, which he maintained would have supported his position that he was the victim of a plot by Gafni and Schreiber to inculpate him in order to exculpate themselves; that this testimony was extremely important and relevant to his defense because these two Government witnesses had been called to show that defendant had masterminded the swindle. This evidence was sought to be introduced by the testimony of the two defense witnesses Brenengan and Cumberland. The Government objected and the defendant made the following offers of proof:

As to Brenengan:

"I offer to prove, your Honor, that in March 1966 Schreiber told this man (Brenengan) that he wasn't worried about the Marketlines letter being closed up because he had some arrangements with the Government about that, that as far as the Allied case was concerned, while Hayutin had nothing to do with the money, they were going to blame it on Hayutin. That is what I offered to prove."

This was later restated by Hayutin's attorney:

"I offer to prove from him that he met Schreiber in March 1966, that Schreiber told him that he, Schreiber, was not concerned about the Marketlines letter being closed up because he had some arrangements about it with the Government; that he wasn't worried about the Allied case because if the worse came to worse, even though Hayutin had nothing to do with it, he was going to blame it on Hayutin."

As to Cumberland:

"I offer to prove through this witness, your Honor, that the witness was engaged in some conversations with Gafni during the period February to May, 1963, respecting his, the witness', working for American Stereophonic in some technical capacity; that in late May of 1963 he had a conversation with Gafni and that Gafni told him that there was some trouble about the Allied situation, that that's why he hadn't concluded his arrangements with him, that he was going to be out of the trouble very shortly because he was going to shift all of the blame to Marvin Hayutin; and then the witness said to Gafni. 'Did Hayutin do anything wrong in this case?' And Gafni said, 'No, but he, Hayutin, can take care of himself and I can't, and therefore I am going to put the blame on him.' That's the whole conversation."

This testimony, while relevant and probative of the defense, also brought into issue the veracity of the Government witnesses, whose testimony as we have seen was quite to the contrary, but neither witness, and they were both extensively cross-examined, was confronted

with these alleged conversations. It was on this basis that the Government objected and the Court sustained the objection because Hayutin's counsel was attempting to impeach the witnesses without having confronted them with these prior statements. He was given the opportunity of recalling both witnesses in order to do so but chose not to do so. Counsel argued then and argues now that the testimony was not sought to impeach the witnesses, but to show a state of mind, of bias or hostility, and that such out-of-court statements were relevant on that issue, irrespective of the testimony given on direct examination by the Government witnesses, and thus admissible without reference to their testimony, even if it contradicted it. The general rule is that a prior self-contradictory statement, where used to discredit a witness, is required to be asked of the witness first, in order to give him an opportunity to deny or explain it. The statements sought to be brought out by defense witnesses fell clearly within that rule and on that ground were properly excludable. The rule is not so clear where a "supposed utterance indicating bias" is sought to be used to show bias or prejudice, although Professor Wigmore urges that the same reasons of fairness dictate that the witness be given the opportunity to deny or explain the utterances. (3 Wigmore on Evidence, 3rd ed., Sec. 953; Accord United States v. White, 225 F.Supp. 514, 519–521 (1963, U.S.D.C.); Smith v. United States, 283 F.2d 16, 87 A.L.R.2d 394 (6th Cir., 1960), cert. den. 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961).) No case has been cited where the rule was dispensed with where the statement showing bias or prejudice was also self-contradictory of the very testimony being given by the witness. Comer v. Pennsylvania R. Co., 323 F.2d 863 (2nd Cir., 1963) was evidence of an objective fact, tending to show bias, not a contradictory statement of the witness. In Greatreaks v. United States, 211 F.2d 674, 14 Alaska

610 (9th Cir., 1954) and Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633 (1941), cert. den. 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145, the foundation had been laid through cross-examination. Where the statement is self-contradictory whether it be used to show bias or to impeach, the reason for the rule would seem to be just as strong. (Burton v. United States, 175 F.2d 960, 965 (5th Cir., 1949), cert. den. 338 U.S. 909, 70 S.Ct. 347, 94 L.Ed. 560.) In fact, the very reason for counsel's decision not to recall the witnesses was in order not to give them an opportunity to deny the statement attributed to them—an opportunity which the law requires they be given. Whether or not he agreed with the Court, it lay in counsel's power to obtain the admission of this testimony by simply recalling the Government witnesses. That he chose not to do so was clearly the decision of experienced trial counsel who did not anticipate any admissions. Schreiber remained available as a witness and no effort was made to recall him to lay the foundation, it being counsel's position that Schreiber should be called by the Government to give his version of any talk Brenengan might testify he had with Schreiber.

With respect to Gafni, the following colloquy took place:

" * * * The Court: If you can get Gafni back here again, and I don't know whether you can—is he in California?

Mr. Gould: That isn't practical. It would hold up the trial.

Mr. Grand: I can get him back, but the government won't pay for his return.

Mr. Gould: I am not going to bring Gafni and have him deny that the conversation took place, your Honor."

Hayutin and his brother Harvey had also testified that Schreiber and Gafni threatened to implicate Hayutin if they were not bought off. Hayutin had been afforded full opportunity to demonstrate

Schreiber's and Gafni's attitudes or "states of mind" toward Hayutin, and perhaps he decided that the testimony of his witnesses would add little. Having made his choice, he should not now urge the "exclusion" of this testimony as error.

Hayutin's second point is that the Court should have directed the taking of the testimony by deposition of the defendant Fischer. Before Hayutin's second trial, he moved for the third time under Rule 15(a), F.R.Cr.P., for an order to take the deposition of Klaus Fischer, a citizen of Germany residing in Munich. Fischer is a defendant named in Count 1 of the indictment. Fischer has never been arrested on this indictment nor has he come to this country. The taking of a deposition, especially on the eve of trial, and the setting of conditions for it, was clearly within Judge Cannella's discretion (United States v. Kelly, 349 F.2d 720, 769–770 (C.A. 2, 1965), cert. den. 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966)). He set the conditions and we cannot say they were unreasonable, if the deposition was to have any meaning. It was clearly doubtful that Fischer was willing and available to submit to deposition since he was invoking German law as to his incompetence as a witness and defendant, and the fact that he was unwilling to attend was not tantamount to being unable to attend (Rule 15(a)).

The remaining points on "control" under the Securities Act of 1933 and cross-examination of character witnesses are disposed of by our decisions in United States v. Re, 336 F.2d 306 (2d Cir.), cert. den. 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964), and United States v. Bilotti, 380 F.2d 649, 653–654 (2d Cir. 1967)

The argument that sending a confirmation slip is not a sale is answered by the language of the statute Section 2(10), 15 U.S.C. § 77b(10); by United States v. Hughes, 195 F.Supp. 795 (D.C.); and by common sense.

The convictions are affirmed.