UNITED STATES of America, Appellee,

v.

Harvey JOHNPOLL,
Defendant-Appellant.

No. 896, Docket 83–1335.

United States Court of Appeals,
Second Circuit.

Submitted March 19, 1984.

Decided June 18, 1984.

**704**

Zane and Rudofsky, New York City (James B. Zane, Edward S. Rudofsky, Jay L.T. Breakstone, David H. Fromm, New York City, of counsel), for appellant.

Rudolph W. Giuliani, U.S. Atty., for the S.D.N.Y., New York City (Patricia Anne Williams, Paul L. Shechtman, Asst. U.S. Attys., New York City, of counsel), for appellee.

1. Section 371 provides:
   "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

2. Section 2 provides:
   "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."
   Section 2314 provides in relevant part:

Before MANSFIELD, NEWMAN and PRATT, Circuit Judges.

MANSFIELD, Circuit Judge.

Harvey Johnpoll appeals from a judgment of conviction entered in the Southern District of New York by Judge Robert L. Carter on September 20, 1983, following a jury verdict finding him guilty of one count of conspiring to transport stolen securities and the proceeds from the sale of those securities in foreign commerce in violation of 18 U.S.C. § 371[1] (Count One); three counts of transporting stolen securities in foreign commerce in violation of 18 U.S.C. §§ 2 and 2314[2] (Counts Three through Five); and three counts of transporting the proceeds from the sale of those stolen securities in foreign commerce also in violation of 18 U.S.C. §§ 2 and 2314 (Counts Ten through Twelve).[3] On September 20, 1983, Judge Carter sentenced Johnpoll to five (5) years imprisonment on the conspiracy count and ten (10) years on each of the six § 2314 counts, with the ten-year sentences to run concurrently with each other but consecutively to the five-year sentence. Judge Carter also imposed a $70,000 fine: $10,000 for each of the seven counts on which Johnpoll was convicted.

Johnpoll argues that the district court erred in (1) admitting into evidence the

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;
   *   *   *   *   *   *
"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

3. Counts Six through Nine charged Johnpoll with transporting negotiable instruments outside the United States without filing appropriate reports, in violation of 31 U.S.C. §§ 1101 and 1059. At the conclusion of the government's case, Judge Carter dismissed those four counts. The jury was unable to reach a verdict on Count Two, one of the four counts charging Johnpoll with transporting stolen securities in foreign commerce, and a mistrial was declared on that count.

deposition testimony of certain Swiss witnesses because those depositions were taken in violation of Fed.R.Crim.P. 15 and violated his Sixth Amendment Confrontation Clause rights, (2) failing to follow required procedures in responding to inquiries from the jury during deliberations, (3) improperly instructing the jury with respect to the inference that could be drawn from his possession of stolen property, (4) failing to direct an acquittal on the ground that the evidence was insufficient to establish that the securities charged in the indictment were stolen, (5) denying him his right to a speedy trial under the Speedy Trial Act, 18 U.S.C. §§ 3161, *et seq.*, and the opportunity to make pretrial motions and to engage in discovery. Johnpoll further argues that the government fraudulently obtained the assistance of the Swiss government under the treaty for Mutual Assistance in Criminal Matters, May 25, 1973, United States-Switzerland, 27 U.S.T. 2019, T.I.A.S. 8302, in conducting its investigation and thereby denied him due process. Finally, Johnpoll contends that the indictment was multiplicitous in charging him in separate counts with unlawful transportation of stolen securities and proceeds from their sale.

Except for the last of these contentions, we find no merit in Johnpoll's various arguments. Accordingly, we affirm his conviction on the conspiracy count (Count One) and the three counts of transporting stolen securities in foreign commerce (Counts Three through Five). We dismiss the other three counts charging unlawful transportation of the proceeds from the sale of the securities (Counts Ten through Twelve) and remand for resentencing in accord with our decision.

The record, viewed as it must be in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), reveals the following. Sometime between March and August 1980, $9.6 million in securities mysteriously disappeared from the vault of Securities Settlement Corporation ("SSC"), a brokerage house in Manhattan. The loss was not detected until late August 1980. From SSC's records, an auditing firm determined precisely which securities were missing, and the auditors testified at trial that the securities had to have been stolen.

Meanwhile, in July 1980, one Alexandra Kacenelenbogen contacted Remy Pfenniger, the president of Gestofinance, a Swiss import-export company, and offered to sell him $400,000 in American securities. Kacenelenbogen told Pfenniger that she was acting on behalf of Harvey Johnpoll, an American businessman who represented certain Italian planters. Pfenniger, who had a prior Swiss conviction for receiving stolen securities, feared that the securities might be stolen and declined the offer. Kacenelenbogen then took the securities to Gestofinance's Geneva offices, where she repeated the proposition to Jean Claude Genoud-Prachex, who worked for Pfenniger. Genoud-Prachex telephoned Johnpoll in New York; Johnpoll assured him that the securities were not stolen, explaining that he wanted to sell them through a Swiss company in order to avoid United States taxes. Following this conversation, Genoud-Prachex checked and determined that the securities had not been reported stolen and subsequently encouraged Pfenniger to pursue the deal. Pfenniger, still hesitant, telephoned Johnpoll and questioned him as to why he was not selling the securities through a bank. Johnpoll replied that he was fearful that a Swiss bank would report the sale. He offered Pfenniger 10% of the sale price if Gestofinance would serve as the intermediary and noted that he had an additional $6,000,000 in securities to sell through Pfenniger's company.

On July 11, 1980, Pfenniger went to the Geneva office of Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), taking the securities that Kacenelenbogen had left with Genoud-Prachex. He opened an account in the name of Gestofinance, requesting Merrill Lynch to determine whether the securities had been reported stolen and, if not, to resell them immediately. That day, Merrill Lynch sold the securities for a net

price of $391,825. The securities were in SSC's name and were later determined to be part of the $9.6 million theft. These securities formed the basis of Count Two, the count upon which a mistrial was declared when the jury was unable to reach a verdict as to Johnpoll's guilt.

Four days later, on July 15, 1980, Pfenniger transferred by wire $25,000 from Gestofinance's Swiss account to European-American Bank in Brooklyn for the account of Prieto International, Inc. ("Prieto"), a company wholly owned by Johnpoll. Five days later, Pfenniger and Kacenelenbogen flew to New York to meet with Johnpoll. Johnpoll reiterated that the securities belonged to Italian planters who wished to sell them through a Swiss intermediary in order to avoid taxes. Johnpoll and Pfenniger agreed that Pfenniger would receive a 2% commission on future sales. It was also agreed that future deliveries would be made by courier and that the courier would meet Pfenniger at the La Coupole cafe across the street from Merrill Lynch's Geneva office. Before leaving New York, Pfenniger gave Johnpoll $293,000 cash as part of the proceeds on the initial sale.

Upon returning to Geneva, Pfenniger informed Susannah Maas, his attorney, about his negotiations with Johnpoll. Pfenniger asked Maas to assist them in avoiding Swiss taxes on the securities sales. Maas in turn set up a Liechtenstein corporation, Groclamare Anstalt ("Groclamare"), and opened an account at Merrill Lynch in Groclamare's name. Thereafter, on three separate occasions—July 31, August 14, and August 15—Johnpoll notified Pfenniger by telephone that a shipment of securities would be arriving in Geneva. All three deliveries were made at the La Coupole cafe by courier: $1,446,397 in securities on July 31; $1,813,759 in securities on August 14; and $2,364,247 in securities on August 15. Those three deliveries formed the basis of Counts Three through Five. On the occasion of each delivery, Pfenniger gave the securities to Maas who in turn deposited them in Groclamare's account at Merrill Lynch for sale. All of the securities were from the SSC theft. As soon as Merrill

Lynch would sell the securities, Maas and Genoud-Prachex would withdraw the proceeds and deposit them into one of three Swiss bank accounts opened by Maas for the purpose of holding the money. Within a day of the deposit, Maas and Genoud would withdraw the funds in cash. By August 26, they had deposited and withdrawn $4,500,000 in cash from these three bank accounts.

After the first courier delivery, Johnpoll flew to Geneva and took a room at a hotel. Shortly thereafter, Pfenniger and Genoud-Prachex brought Johnpoll $725,000 in cash that had been withdrawn by Maas and Genoud-Prachex from the Swiss bank accounts. At Johnpoll's direction, on August 8, Pfenniger transferred another $192,450 to three American bank accounts: $72,170 to Prieto's account at European-American Bank; $86,610 to Johnpoll's Fine Art to the Consumer ("FATTC") account at the same bank; and $33,670 to the "Coming Generation American Musical Theatre Corporation" account at Chemical Bank. The $86,610 transfer to Prieto's account formed the basis of Count Ten of the indictment. At the same time, Johnpoll deposited $50,000 into yet another Swiss bank account in the name of Cavar Anstalt, a shell corporation that Maas had created at Johnpoll's request. Later that day (August 8), Johnpoll returned to New York with Maas; at customs, Maas declared that she was bringing $350,000 in cash into the country. Once through customs, she gave the cash to Johnpoll.

On August 15, after the sale of more stolen securities, Johnpoll telephoned Pfenniger with instructions to transmit a portion of the proceeds to New York. Pfenniger then transferred $73,159 to FATTC's account and $121,946 to Prieto's account. Those two transfers formed the basis of Counts Eleven and Twelve of the indictment respectively. Late that evening Johnpoll flew from New York to Geneva to collect the remaining monies from the sales. Back in Switzerland, Johnpoll travelled on August 18 to Bank Hapoalim in Zurich, where he had previously opened

accounts in his own name, his wife's name, and in the names of each of his two children. He deposited $30,000 into his wife's account and $10,000 into each of his children's accounts. On August 25, Johnpoll deposited $900,000 into his Bank Hapoalim account and then immediately transferred $750,000 by wire to the Florida bank account of Jay R. Schneider. The next day Johnpoll deposited an additional $874,378 into his Bank Hapoalim account. On September 1, Johnpoll opened two new accounts at the Bank Hapoalim: an account for FATTC, into which he deposited $150,000, and a new account in his wife's name. Three days later, Johnpoll transferred $1,003,299 from his account at the bank into his wife's new account.

In the meantime, Merrill Lynch received information indicating that SSC's securities had been stolen. It immediately froze Groclamare's account. On September 5, Pfenniger informed Johnpoll of Merrill Lynch's action and told him that if the securities were stolen Pfenniger would go to the police. Within 24 hours of their conversation, Johnpoll fled Switzerland for the United States. Thereafter, on September 18, Johnpoll's wife telephoned the Bank Hapoalim and instructed it to wire $750,018 to an "Idea Development" account at Chemical Bank.

Two-and-a-half years later, on February 18, 1983, Johnpoll was indicted. On April 28, 1983, the government moved the district court, pursuant to Fed.R.Crim.P. 15,[4] for leave to take the depositions in Switzerland of four Swiss witnesses—Pfenniger, Genoud-Prachex, Maas, and Ari Falkolf, an officer at the Bank Hapaolim—on the ground that their attendance at trial could not be reasonably obtained. The government informed the court that although all of the Swiss witnesses with the exception of Falkolf had agreed to travel to the United States to testify at appellant's trial, each demanded payment for their time and trouble. Genoud-Prachex, for example, required payment of $250 per day for time away from his business; Pfenniger required $150 per day for subsistence and $390 per day for time away from business. Both Genoud-Prachex and Pfenniger insisted that they must be allowed to bring their attorneys and that their attorneys' air fare and fees also be reimbursed. Maas, the other key witness, demanded compensation for time away from work as well. The government contended that it did not have authorized funds to meet those demands; it was prepared to pay travel costs and "maintenance" costs, but no more.[5]

At a May 3 conference Judge Carter requested the government to negotiate with the witnesses in order to reduce their demands. This proved troublesome, as the government was not allowed to communicate directly with the Swiss witnesses and the Swiss Central Authority refused to ask the witnesses to reduce their demands. On May 6, the government reported to Judge Carter that it had been unable to persuade the witnesses to reduce their demands. Accordingly, Judge Carter authorized the depositions.

At the May 6 conference the government reminded Judge Carter that there was an outstanding Swiss warrant for Johnpoll's arrest dating from 1980. The government expressed the willingness to make arrangements for a simultaneous telephone hookup so that Johnpoll could hear the proceedings and advise his counsel.[6] On May 24 the

---

**4.** Rule 15 provides in relevant part:

   "(c) *When Taken.* Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witnesses be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place...."

**5.** Under 28 U.S.C. § 1821, the government is required to pay the witness travel expenses, a $30 per day witness fee, and $75 per day for subsistence.

**6.** Johnpoll proceeded *pro se* at his trial. However, during the pre-trial period, Johnpoll employed a "legal advisor" to assist him in the preparation of his defense.

government informed the court that arrangements had been made for the depositions to be conducted during the week of May 30, and that it had made airplane and hotel reservations for Johnpoll and his attorney should either or both of them wish to attend.[7]  At the May 24 conference Johnpoll requested authorization to depose "six or seven" other witnesses.  However, since he never provided the names of those witnesses they were not deposed.

On May 27, before leaving for the airport, the Assistant U.S. Attorney in charge of the case telephoned Johnpoll's attorney, Edward Rudofsky, and left a message to the effect that the Swiss magistrates in charge of the scheduled depositions had finally agreed to allow full cross-examination.  Earlier, those magistrates had indicated that all questions must be submitted in advance.  The prosecutor also noted that arrangements had been made to permit a telephone hook-up so that Johnpoll could listen to the depositions.  The prosecutor left for Switzerland at the appointed time but Rudofsky did not.  Instead, Rudofsky delivered a letter to the U.S. Attorney's Office stating that he would not attend the depositions and that Johnpoll would be represented by a Swiss attorney for the purpose of raising objections to the proceedings.[8]  On that same day, May 27, this court denied Johnpoll's petition to stay the depositions.

In Switzerland, the government deposed Pfenniger, Genoud-Prachex, Maas, Farloff, and Rene Gambazzi, a police officer whose deposition had been unscheduled.  Johnpoll did not listen to the depositions through a telephone hook-up since both of his Swiss attorneys declined to participate in the depositions other than to state their opposition to the proceedings.  Neither attorney cross-examined the deponents, although the magistrate had indicated his willingness to allow such examination.

7.  In addition to making the reservations, the government was also prepared to pay the travel and hotel costs incurred by Johnpoll and his attorney, although it told the court that it would pay those expenses only if required to do so by the court.

When the Assistant U.S. Attorney returned to the United States with the depositions, Judge Carter examined them, heard Johnpoll's objections, excised those portions that were prejudicial or irrelevant, and determined that the rest of the deposition testimony was admissible evidence.  The depositions were admitted into evidence at Johnpoll's trial.

Trial commenced on July 11, 1983.  On July 20, 1983, the jury found Johnpoll guilty of conspiring to transport stolen securities and proceeds from the sale of those securities in foreign commerce (Count One) and of actual transportation of stolen securities or their proceeds on six separate occasions (Counts Three through Five and Ten through Twelve).

## DISCUSSION

### The Swiss Deposition Testimony

Johnpoll argues that the taking of the Swiss depositions for use at trial violated Fed.R.Crim.P. 15 which permits such depositions only in "exceptional circumstances" and "in the interest of justice."  He contends that the requisite exceptional circumstances did not exist and that the admission into evidence of the depositions taken in Switzerland of the five witnesses violated his Sixth Amendment confrontation rights.  We disagree.

■ The decision to grant or deny a motion to take a deposition rests within the sound discretion of the trial court, *United States v. Hayutin*, 398 F.2d 944, 954 (2d Cir.), *cert. denied*, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968), and will not be disturbed absent clear abuse of that discretion.  *United States v. Sindona*, 636 F.2d 792, 803 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981); *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir.1962), *cert. denied*, 372

8.  Rudofsky's letter was received by an Assistant United States' Attorney who was waiting for Rudofsky in order to give him his airline tickets.

U.S. 919, 83 S.Ct. 734, 9 L.Ed.2d 725 (1963). It is well-settled that the "exceptional circumstances" required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial. *United States v. Singleton,* 460 F.2d 1148, 1154 (2d Cir.1972), *cert. denied,* 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973); *United States v. Sun Myung Moon,* 93 F.R.D. 558, 559 (S.D.N.Y. 1982). Unavailability is to be determined. according to the practical standard of whether under the circumstances the government has made a good-faith effort to produce the person to testify at trial. *See Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1979); *California v. Green,* 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951, n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring). Moreover, "[t]he lengths to which the prosecution must go to produce a witness before it may offer evidence of an extra-judicial declaration is a question of reasonableness." *California v. Green, supra,* 399 U.S. at 189 n. 22, 90 S.Ct. at 1951 n. 22.

In the present case the foregoing standards were met. The testimony of the Swiss witnesses was clearly material since they had dealt extensively with Johnpoll in his making of arrangements for transporting the stolen securities and secreting the proceeds from their sale. Indeed, it is unlikely that Johnpoll could have been convicted without their testimony.

Moreover, the surrounding circumstances satisfy us that the witnesses could not be said to be personally available for trial within the meaning of Rule 15. In the first place, being Swiss nationals in Switzerland, they were not amenable to service of United States process, either by statute or treaty.[9] *United States v. Germann,* 370 F.2d 1019, 1022–23 (2d Cir.), *vacated on other grounds,* 389 U.S. 329, 88 S.Ct. 503, 19 L.Ed.2d 559 (1967). The government asked

the witnesses to appear voluntarily and toward that end offered to pay their travel expenses, $30 per day witness fee and $75 per day subsistence fee as authorized by 28 U.S.C. § 1821. However, one witness, Falkoff, flatly refused to come to the United States and the other three refused unless the government agreed to certain conditions. Pfenniger insisted that he be paid $150 per day for subsistence, $390 a day for time away from business, plus the air fare and legal fees of his attorney who would accompany him. Maas refused unless she was reimbursed for time away from business. Like Pfenniger, Genoud-Prachex insisted on being paid compensation for lost business time and the cost of bringing his attorney with him.

In our view the government's refusal to accede to their demands (after the Assistant U.S. Attorney on the case unsuccessfully sought authority from the Attorney General) was not unreasonable. It is readily apparent that in the absence of extraordinary circumstances (not present here), even assuming the government had funds to meet the witnesses' demands, its submission to these conditions would establish a precedent that could have extensive harmful repercussions. If it were required to yield to such demands before being permitted to avail itself of Rule 15, it might then be forced in the future to submit to potentially unlimited pressure from foreign witnesses (requesting much higher levels of compensation), which might justify criticism that their testimony was being "bought." The reasonableness of the government's position is further supported by the precautions imposed by the deposition procedure prescribed by Rule 15, subsection (c) of which authorizes the court, when a defendant is unable to bear the expenses of the taking of the deposition, to direct the government to pay "the expense of travel and subsistence of the defendant

**9.** Under the treaty for Mutual Assistance in Criminal Matters, May 25, 1973, United States-Switzerland, 27 U.S.T. 2019, T.I.A.S. 8302, the United States cannot subpoena a Swiss national. 27 U.S.T. at 2046. The treaty does permit the

United States to request the Swiss to compel a witness' appearance in Switzerland for a deposition, although it does not allow the United States to communicate directly with such witnesses. 27 U.S.T. at 2035–36.

and his attorney for attendance at the examination and the cost of the transcript of the deposition," all of which was ordered in the present case.

■ Johnpoll argues that the government's refusal to meet the foreign witnesses' demands was nevertheless unreasonable because 28 U.S.C. § 524(a)(1) makes appropriations available to the Attorney General "for payment of ... compensation and expenses of witnesses and informants, all at the rates authorized or approved by the Attorney General" and that the government in the past has pursuant to § 524(a)(1) expended thousands of dollars for witnesses in protective custody because of death threats. *See, e.g., United States v. Librach,* 536 F.2d 1228, 1230–31 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976) ($9,947); *United States v. Partin,* 493 F.2d 750, 757 (5th Cir.1974), *appeal after remand,* 552 F.2d 621 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) ($26,000 for one witness; $5,000 for another). Johnpoll, however, misconstrues the purpose of § 524(a)(1). In contrast to 28 U.S.C. § 1821, which mandates that fees and allowances be paid to witnesses appearing in "any court of the United States" in an amount not to exceed certain prescribed figures, § 524(a)(1) is designed to provide funds for security of government witnesses without any such specific limit on the amount that may be spent in the case of each witness, which would obviously turn on his or her security needs. *United States v. Librach, supra,* 536 F.2d at 1230 (§ 524(a)(1) authorizes support payments for witnesses in protective custody because of death threats); *United States v. Partin, supra,* 493 F.2d at 757 (§ 524(a)(1) authorizes the government "to pay the maintenance costs of material witnesses in protective custody"). Indeed, the original Justice Department regulations promulgated under § 524, later enacted into law, 18 U.S.C. preceding § 3481, provided for the protective custody of witnesses in organized crime cases. Since the security of the witnesses was not an issue in the present case, § 524 cannot be read as authorizing or requiring the government to pay more than the 28 U.S.C. § 1821 statutory witness fees.

■ Johnpoll's claim that admission of the deposition testimony violated his confrontation rights must likewise be rejected. The Confrontation Clause does not preclude admission of prior testimony of an unavailable witness, *Mattox v. United States,* 156 U.S. 237, 5 S.Ct. 337, 39 L.Ed. 409 (1895), provided his unavailability is shown and the defendant had an opportunity to cross-examine. *Ohio v. Roberts, supra,* 448 U.S. at 73, 100 S.Ct. at 2542; *Mancusi v. Stubbs,* 408 U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972); *California v. Green, supra,* 399 U.S. at 165–66, 90 S.Ct. at 1938–1939. In the present case, Johnpoll had the full opportunity, at government expense, with his attorney to confront and cross-examine the Swiss witnesses, which he waived when he and his attorney decided not to attend the taking of the depositions. Accordingly there was no violation of his Sixth Amendment rights in admitting their deposition testimony.

*The Response to the Jury's Inquiries*

■ Johnpoll next argues that the district court failed to comply with the dictates of *United States v. Ronder,* 639 F.2d 931 (2d Cir.1981), specifying the procedures to be followed when a jury during the course of its deliberations asks the court a question. In *Ronder* we set forth the requirements as follows:

"Before the jury is recalled, the note should be marked as a court exhibit and be read into the record in the presence of counsel and the defendant. ... Counsel should be afforded an opportunity to suggest appropriate responses. During this colloquy, it is also helpful for the judge to inform counsel of the substance of his proposed response, or even to furnish a written text of it, if available. ... After the jury is recalled, the trial judge should generally precede his response by reading into the record in their presence

the content of any note concerning substantive inquiries." *Id.* at 934.

The jury in this case commenced its deliberations at 1:03 P.M. on July 19, 1983. At 2:30 P.M. it sent out its first note, which requested certain exhibits that were then transmitted to it by agreement of counsel. Thereafter, at approximately 3:50 P.M., the court received a second note from the jurors asking whether "the object of the conspiracy stated in the indictment [is] inherent in the conspiracy charge [i.e.] do we follow the indictment verbatim." Judge Carter *sua sponte* sent the note back to the jury, asking for a clarification. Subsequently Judge Carter read the note into the record and advised the parties of the action he had taken. They conceded that they did not understand the question either. Neither party objected to his request for a clarification. Since the judge's response to the jury was not substantive, the failure to conform literally to the requirements of *Ronder* was harmless.

At 4:35 P.M. the jury submitted its third note to the court, which inquired whether "the defendant [must] know beyond reasonable doubt that the securities were stolen" and whether "on count I ... the jury has to agree on the object of the conspiracy stated on page 1, paragraph 2, of the indictment." Judge Carter promptly read this note into the record and asked the parties whether they had any views on how he should respond. Having sought and received suggestions from the parties, Judge Carter recalled the jury. At the outset, Judge Carter told the jury that he assumed the second note was a clarification of the first note. No juror disputed that assessment. He then re-read his charge on the elements of a § 2314 offense as well as the

charge on willfulness and knowledge. Turning to the second part of the jury's note, Judge Carter informed the jury that it need find only one of the objects of the conspiracy, not both, to support a conspiracy conviction.[10] Thus, with respect to this second jury inquiry, Judge Carter complied completely with the requirements of *Ronder* except for informing the parties beforehand of his proposed response, an oversight that was harmless.

At 5:27 P.M. the jury sent out its fourth note requesting certain charts that had been admitted into evidence during trial. In accordance with the requirements of *Ronder*, Judge Carter showed the note to the parties and requested their views. After considering those responses he sent the charts into the jury, with supporting exhibits.

The jury's final note was received the next morning at 11:35 A.M. Once again Judge Carter read the note into the record, discussed proposed responses to the note with the parties, and recalled the jury and instructed them accordingly. Thus, Judge Carter substantially complied with the requirements of *Ronder* and any slight deviations were harmless.

*The Jury Instruction Regarding Possession of Recently Stolen Property*

Section 2314 of Title 18 requires that the defendant "know[ ]" that the securities have been stolen. Judge Carter charged the jury:

"Possession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which a jury may reasonably draw an inference and find in the light of the surrounding circumstances shown by the evidence in the case that

---

10. Johnpoll argues that it was error for the court to instruct the jury that they need find that the appellant committed only one of the objects of the conspiracy, rather than all of the objects of the conspiracy. He relies on *United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir. 1982), in which the Ninth Circuit held that a "one-is-enough" conspiracy charge was erroneous. Yet the *DeLuca* court so held because the defendant in that case was acquitted on one of the substantive counts, thus making it impossi-

ble for the reviewing court to know whether the jury convicted on the conspiracy count because of conspiracy to commit the acquitted act or the guilty act. But in the instant case, the jury found Johnpoll guilty of both objects of the conspiracy—"to obtain the proceeds from the sale of stolen securities and to conceal and secrete those proceeds." Thus, there was no error to instruct the jury that conspiracy to commit either object of the conspiracy was sufficient to support a guilty verdict.

the person in possession knew the property had been stolen. You are, of course, not to required [sic] to draw this inference.

"In considering whether possession of recently stolen property has been satisfactorily explained, you are reminded that the defendant has a constitutional right not to take the witness stand and testify."

Johnpoll argues that this instruction failed to define the word "recently" and that by failing to make clear that possession may be satisfactorily explained through other circumstances it shifted to Johnpoll the burden of explaining his possession of the stolen securities. Putting aside his waiver of the objection by failure to raise it below, *United States v. Praetorious*, 622 F.2d 1054, 1061–62 (2d Cir.1979), *cert. denied* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980), we find it to be meritless.

■ The word "recently" is neither outside common understanding nor so technical or ambiguous as to require specific definition. *United States v. Crockett*, 506 F.2d 759, 762 (5th Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). Explication of the term was unnecessary here because the securities were in Johnpoll's possession less than four months after they were stolen, a period clearly encompassed by the term "recently." *United States v. Tisdale*, 647 F.2d 91, 93 (10th Cir.), *cert. denied*, 454 U.S. 817, 102 S.Ct. 95, 70 L.Ed.2d 86 (1981) (recently stolen property instruction proper despite 16-month lapse between theft and possession); *Boehm v. United States*, 271 F. 454 (2d Cir.1921) (nine months).

■ Nor did Judge Carter's charge impermissibly shift to Johnpoll the burden of proving lack of guilty knowledge. To be sure, as the Supreme Court stated in *Barnes v. United States*, 412 U.S. 837, 846 n. 11, 93 S.Ct. 2357, 2363 n. 11, 37 L.Ed.2d 380 (1973), "the practical effect of instructing the jury on the inference arising from unexplained possession of recently stolen property is to shift the burden of going

forward with evidence to the defendant." But the Court went on to note

"that where there is a 'rational connection' between the facts proved [possession] and the fact presumed or inferred [knowledge], it is permissible to shift the burden of going forward to the defendant. Where an inference satisfies the reasonable-doubt standard, as in the present case, there will certainly be a rational connection between the fact presumed or inferred (in this case, knowledge) and the facts the Government must prove in order to shift the burden of going forward (possession of recently stolen property)." *Id.*

In the present case the inference of knowledge drawn by the jury satisfied the "reasonable-doubt standard," particularly in view of Judge Carter's instruction that the inference was permissible, not mandatory, and that no adverse inference could be drawn from Johnpoll's decision not to testify.

*Sufficiency of the Evidence that the Securities were Stolen*

■ Johnpoll argues that the evidence was insufficient as a matter of law to prove that the securities were in fact stolen from SSC. An appellant challenging the sufficiency of the evidence bears "a very heavy burden." *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Indeed, a conviction must be sustained if, viewing the evidence in the light most favorable to the government, *Glasser v. United States, supra*, 315 U.S. at 80, 62 S.Ct. at 469, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. That standard was met here.

The evidence established that the securities in SSC's "sealed [and] secured" vault, into which entry could be gained only by a magnetically coded card, were closely monitored and documented. After the loss was discovered, an extensive audit determined that the securities had not left the vault in the normal course of SSC's business and that false entries had been made in SSC's

records to conceal their removal. Indeed, the audit manager testified that he could not "think of another way these securities could have left the premises without being documented in the records other than that they were stolen." This evidence supported an inference of theft. That the security procedures at SSC could have been even more exacting does not negate the inference properly drawn by the jury that the securities were in fact stolen.

### Compliance With the Speedy Trial Act

■ The Speedy Trial Act, 18 U.S.C. §§ 3161,[11] et seq., mandates that the trial of a defendant commence "within seventy days from the filing date ... of the ... indictment, or from the date the defendant has appeared before a judicial officer of the court...." 18 U.S.C. § 3161(c)(1). Johnpoll was arraigned on February 25, 1983, and thus, absent excusable delay, trial was required to commence by May 6. Johnpoll contends that his trial, which began on July 11, 1983, did not commence within the statutory period and that therefore his conviction should be reversed in accord with 18 U.S.C. § 3162(a)(2).[12] We disagree.

Between the date of arraignment, when the speedy trial clock began to run, and the time of trial, there were three periods of excusable delay which tolled the speedy trial time period. First, the period between March 4 and March 22, during which time Johnpoll's pretrial motions were under consideration by the court, was automatically excludable under 18 U.S.C. § 3161(h)(1)(F); this 18-day period was reasonably required for that purpose. For the same reason the period from April 28, when the government moved for authorization to depose the Swiss witnesses, until May 6, when the court granted that motion, was automatically excludable. Third, the periods from April 26 to May 19 and from May 26 to May 27, when Johnpoll pursued interlocutory appeals to this court, were properly excluded in accord with 18 U.S.C. § 3161(h)(1)(E).

Taking into account these proper exclusions, the speedy trial date was extended until June 20, the date set by Judge Carter for trial. However, prior to that date Johnpoll filed with the Central Authority in Bern formal opposition to the Swiss depositions and the Swiss authorities agreed to retain all of the depositions until the matter was resolved, thus delaying the arrival of the deposition materials from Switzerland until July 5. At that point, despite Johnpoll's request for "a later date," Judge Carter set trial for July 11. We find that the postponement of trial from June 20 until July 11 was justified by the unavailability of the deposition evidence and that Johnpoll's Speedy Trial Act rights were therefore not abridged.

### Opportunity to Make Pretrial Motions and Engage in Discovery

Johnpoll's claim that he was denied the opportunity to make pretrial motions is

---

11. Section 3161 provides in relevant part:

"(c)(1) In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. If a defendant consents in writing to be tried before a magistrate on a complaint, the trial shall commence within seventy days from the date of such consent."

12. Section 3162(a)(2) provides in relevant part:

"(2) If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed

on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section."

frivolous. He was afforded ample opportunity to make pretrial motions and indeed did so, claiming that the indictment should be dismissed on the grounds of double jeopardy, pre-indictment delay, grand jury abuse, and prosecutorial misconduct. He also moved to dismiss Counts Ten through Twelve and Counts Two through Five on the ground of multiplicity, which was duly considered and ruled upon by the district court.

### Claim of Violation of the Treaty With Switzerland

■ In June 1981, pursuant to the treaty for Mutual Assistance in Criminal Matters, May 25, 1973, United States-Switzerland, 27 U.S.T. 2019, T.I.A.S. 8302, the United States requested the assistance of the Swiss in the investigation of "a group of persons ... who possessed stolen securities worth about nine million U.S. dollars and transported them to Geneva, Switzerland, where they were sold," an offense for which assistance by the Swiss is compulsory. Switzerland honored the request and transmitted documentary evidence to the United States.

When the grand jury returned an indictment charging Johnpoll with customs as well as stolen security offenses, the government told the court that in accord with the Treaty, which does not require assistance regarding investigations concerning "violations with respect to ... customs duties", 27 U.S.T. at 2027, the Swiss documents "should not be considered by the [trial] jury in connection with [the customs] counts" and suggested an appropriate limiting instruction.

Johnpoll argues that the evidence received from Switzerland should be suppressed because it was fraudulently obtained on the government's representation that it was for use in prosecution of security theft violations covered by the Treaty whereas the grand jury also indicted him for customs violations, which were not so covered. We disagree.

As long as the evidence was used to prosecute violations covered by the Treaty, the government was not precluded from

also prosecuting other related non-treaty offenses, particularly in view of its consent to an appropriate instruction limiting the use of the evidence. Moreover, Article 37(a) of the Treaty expressly bars Johnpoll from gaining the right thereunder to suppress or exclude evidence of the type furnished in this case. See 27 U.S.T. at 2056. In any event the matter has been mooted by the district court's dismissal at the close of the government's case of the non-treaty customs offenses (Counts Six through Nine).

### The Multiplicitous Indictment Claim

Johnpoll contends that the various alleged acts of transporting stolen securities and the proceeds thereof give rise to but a single offense and that the seven substantive counts of the indictment should have been reduced to a single count. In the alternative, he argues that the transportation of the proceeds from the conversion of the stolen securities cannot be differentiated from the transportation of the securities themselves and that therefore Counts Ten through Twelve should be dismissed.

■ Under 18 U.S.C. § 2314 each interstate or foreign transportation of stolen securities constitutes a separate violation of § 2314, even if the various acts of transportation are part of a single scheme. *United States v. Gotches*, 547 F.2d 80, 82 (8th Cir.1977); *United States v. Flick*, 516 F.2d 489, 495–96 (7th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 282, 46 L.Ed.2d 260 (1975). In this case, each of the three separate transportations of stolen securities (Counts Three through Five)—on July 31, August 14, and August 15, 1980, respectively—for which Johnpoll was convicted, properly constitutes a separate offense. Since each transportation involved different stolen securities each could be properly treated as a separate unit of prosecution under the statute.

■ Separate prosecution of the transportation of "proceeds" of stolen securities, as distinguished from transportation of the securities themselves, however, presents a more difficult question, the answer to which depends on (1) whether "proceeds"

must be treated as the same as the "securities," and, if so, (2) whether the transportation of proceeds constitutes a separate transportation within the meaning of § 2314. Congress, of course, has the power to define and punish each act as a separate crime, *Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955), and has done so with respect to some offenses, such as when it made each separate mailing or telephone call a violation of the mail fraud or wire fraud statutes, respectively. *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916); *United States v. DeFiore*, 720 F.2d 757, 762 (2d Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984). In determining whether there was a legislative intent to permit fragmentation so that each act might be prosecuted as a separate offense, we are guided by the principle that in cases of ambiguity or doubt, "the rule of lenity dictates that only one offense may be charged," *United States v. Pelusio*, 725 F.2d 161, 168–69 (2d Cir.1983). Section 2314 mentions only "securities or money" without any reference to "proceeds." In interpreting § 2314 we have treated proceeds as the same as the original property obtained by fraud, holding that "it is impossible to find any reason in the purpose of the statute to distinguish between the original property and its substitute," *United States v. Walker*, 176 F.2d 564, 566 (2d Cir.) (per L. Hand, J.), *cert. denied*, 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949); see also *United States v. Caci*, 401 F.2d 664, 672–73 (2d Cir.1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 (1969). We believe the same principle applies here and accordingly we treat the proceeds as the same as the stolen property from which they were derived.

█ The question of whether each of the transmittals of proceeds from Switzerland to New York charged in Counts Ten through Twelve may be treated as a separate unit of prosecution under § 2314 turns on whether it constituted solely a continuation of a transportation alleged in Counts Three, Four or Five, or represented a separate *additional* transportation of a portion of the proceeds from the sale of that property. If it was the former, it could not properly be charged as a separate crime since this would permit fragmentation of one continuous transportation into several segments, opening the door to mischievous abuse of the statute.

If, on the other hand, proceeds were divided into two or more separate portions, each of which was then separately transported, the interstate or foreign transportation of each *additional* lot would amount to a separate violation of § 2314. *United States v. Gotches, supra; United States v. Flick, supra.* However, the indictment in the present case fails to allege whether any of the transportations alleged in Counts Ten through Twelve were separate transmittals of additional portions of any of those charged in Counts Three through Five and this issue was not presented to the jury for resolution. Accordingly we conclude in accordance with the rule of lenity that Counts Ten through Twelve must be treated as duplicative and dismissed as multiplicitous.[13]

The judgment of conviction of Counts One, Three, Four and Five of the indictment is affirmed. The judgment of conviction of Counts Ten through Twelve is reversed and the case is remanded for dismissal of the latter counts and resentencing.

---

**13.** In view of the result reached it is unnecessary for us to determine whether Counts Ten through Twelve of the indictment, in alleging "wire *transfers* of funds which were the proceeds of the sale of stolen securities," (emphasis added) states a crime in violation of 18 U.S.C. § 2314, which is limited to punishment of any person who "transports" stolen property, except to note that the term "transport," which refers to physical carriage, has a different and more restricted meaning than the terms "transfer" or "transmit by wire." *See, e.g.*, 18 U.S.C. §§ 1341, 1343.